# Wheeling.

## VANCE v. EVANS et al.

(Absent, HAYMOND, JUDGE).

Decided October 25, 1877.

1877.
Special Term.

1. A decree between co-defendants can only be based upon the pleadings and proofs between the complainant and defendant.

2. Where a case is made out between defendants by evidence arising by pleadings and proofs between the complainant and defendants, a court of equity should render a decree between the co-defendants.

3. A defendant, who by his answer asks the court to make inquiries through its commissioner, more extended than the statements in the bill might justify, and upon such inquiry to decree between him and a co-defendant, is thereby precluded in the appellate court from assigning as error such enlarged extent of inquiry, or that a decree between co-defendants was based thereon.

4. It is proper to charge interest upon estimated rents and profits, where the land is occupied by the consent of the owner, or where one tenant in common holds and enjoys the whole land by the consent of his co-tenant.

5. As a general rule, where it is necessary to adjudicate the rights of an assignee, the assignor must be made a party to the cause; but there is this exception to this general rule, that when the assignment is absolute and unconditional, leaving no equitable interest whatever in the assignor, and the extent and validity of the assignment is neither doubted nor denied, and there is no remaining liability in the assignor to be affected by the decree, it is not necessary to make the assignor a party.

An appeal, by William Conway, one of the defendants below, from several decrees of the circuit court of the county of Monongalia, rendered in a cause in chancery,

in which Addison S. Vance was complainant, and George D. Evans and others were defendants.

Hon. John A. Dille, formerly Judge of said circuit court, rendered the decrees complained of.

GREEN, PRESIDENT, furnishes the following statement of the case:

The record in this case consists of more than seven hundred and fifty pages of manuscript. In stating the case, I shall set forth only so much of this voluminous record, as is necessary to the full understanding of the matters in controversy in this Court, omitting many matters which have been in controversy in the court below, but which have been settled by the decrees of the court, and which settlement has been acquiesced in by the parties, and also other matters which are still in controversy before this Court, but which, in the view taken by us of the case, it is unnecessary to decide. So much only of such matters will be stated, as is necessary to comprehend fully, why we regard such matters as irrelevant and unnecessary to be decided in this case.

On April 3, 1862, Brown & Woodley obtained a judgment in the circuit court of Monongalia county against George D. Evans and another; and on July 29, 1862, William G. Brown recovered a judgment in the county court of said county against said Evans and another. At the September term 1862, five different judgments were obtained against said Evans, or against him and others, all of which judgments were promptly docketed. The defendants in these several judgments, other than Evans, were insolvent, with the exception of the plaintiff in this cause. After the commencement of the September term 1862, of the circuit court of Monongalia county, two deeds of trust, executed by Evans, were admitted to record in the clerk's office of the county court of Monongalia county, and one of them, which conveyed some land in Marion county, in the clerk's office of the county court of that county. By one of these deeds of trust

Evans conveyed to Warren C. Dorsey, his household and kitchen furniture, and all his personal estate, and certain real estate in Monongalia county, in trust to secure certain specified debts. By the other deed of trust, Evans conveyed to Benjamin M. Dorsey certain bank stock and certain real estate in Monongalia and Marion counties, in trust to secure certain debts, and among them a debt of about $3,000.00 to William Conway.

Among the judgments, rendered against Evans and others, at the September term 1862, of the circuit court of Monongalia county, was one in favor of the Frostburg bank against said Evans and five others, including Addison S. Vance, the plaintiff, for $1,502.03, with interest on $1,500.00, a part thereof, from April 17, 1861, and costs. The foundation of this judgment was a negotiable note given by one Scott, and endorsed by all the other defendants, against whom said judgment was rendered, including said Addison S. Vance, who was the last endorser; execution issued on said judgment, and said Addison S. Vance was forced to pay it on April 27, 1865. John H. Hoffman, who was substituted as trustee in place of Warren C. Dorsey, advertised the property for sale under his deed of trust. On January 9, 1867 Addison S. Vance filed his bill in this cause, setting forth all the above facts, and stating that all the other defendants, except Evans, in all said judgments, were insolvent, claiming that he had a right to be substituted to the lien of the Frostburg bank on the real and personal property of Evans; and that this lien was superior to that created by the said deeds of trust, which were not recorded till after the term commenced at which said judgment was rendered, asking that Hoffman be enjoined from making said sale; that the amount due on said judgment debts, as well as on the debts named in the deed of trust, be ascertained; that Evans's property be made liable to his, plaintiff's, claim, and for general relief. He made parties defendants all the plaintiffs and defendants in said judgments, all the creditors named in

these deeds of trust, and the personal representatives of such of them as were dead, Basset; who had bought one of these tracts of land of Evans since the giving of the deeds of trust, and the trustee, and substituted trustee, in these deeds of trust. The injunction prayed for was awarded. In April 1867 William Conway answered, alleging, that when said deeds of trust were executed, Evans was indebted to him $3,000.00, or more, for money paid out for his use, and further stating, that he and Evans had bought of one Willey, a tract of land on Plum run, Marion county, for which each of them paid $1,000.00 as the cash payment, and gave their bond for the balance of purchase money, $5,000.00; that he had made permanent improvements on this farm which cost him at least $650.00; that this $5,000.00 bond had been assigned to one Chisler; and that he had paid his executor on it at different times $4,700.00, for which he produced receipts and that he had paid Chisler before his death, on April 6, 1856, $300.00 but had lost his receipt; that he had paid taxes on this land to the amount of $234.22, and that he holds two bonds of Evans to John Dawson of $250.00 each, given for the purchase of the Dawson farm owned by Evans. He produces these bonds, but their is no assignment of them to him. And he asks that the court will adjust and adjudicate the difficulties arising in this cause between him and the plaintiff and other contestants, and if deemed necessary he be permitted to file a cross-bill. He afterwards filed a supplemental answer, claiming a further payment of $150.00 on April 6, 1855, on the bond of Evans & Conway to Willey of $5,000.00, which he states he omitted by mistake in his answer. Conway took a number of depositions intended to sustain these allegations in his answers. And on May 8, 1867, replications having been filed to all the answers, and the cause being matured for hearing, the court decreed that the cause be referred to a commissioner to ascertain and report the debts due under the deed of trust; the

1877.
Special Term.

Vance
v.
Evans et al.

judgments against Evans, and their priorities, the real and personal estate of Evans, and the annual value of the real estate, the balance due to Chisler's ex'or on the obligation of Evans & Conway to Willey for purchase of the Plum run farm, and what portion of the purchase money of said farm had been paid by each of these parties; and to settle the accounts of Evans & Conway, and ascertain what, if anything, is due to Conway, and also what amount of improvements Conway has put on the Plum run farm and what taxes he has paid on it, and what is the value of the rents and profits of this farm since it was bought by Evans & Conway, and who has received them. At the March term 1870 Chisler's ex'or, who has been by order of the court made a defendant, filed his answer in which he states, that this bond of Evans & Conway for $5,000.00 to Willey, given for the balance due on the purchase of the Plum run farm, was assigned by Willey to George S. Bacon on September 2, 1855, and on December 25, 1855 George S. Bacon assigned this bond to his testator John S. Chisler, " reserving all interest that may have accrued prior to the first day of April 1855," that the balance due him, the executor of Chisler, on this bond was on August 31, 1865 $1,068.00; and that it is secured by a vendor's lien on the Plum run farm. The commissioner, William P. Willey, under said order, made May 1867, made his report October 1, 1869. This report was in many respects imperfect, and did not lie in the office of the commissioner the time required by law. He does not report accurately the amount of the debts, secured by the deeds of trust, executed by Evans, but states about the amount of the principal of some of these debts, without stating from what time they bear interest; and other of these debts he excludes, because of want of proof of the amount due on them, though he says they are probably unpaid. He reports but two judgments, though the bill and exhibits show their were many other judgments against him; the real estate owned by Evans

and the rental value thereof is very imperfectly reported,

some tracts owned by Evans, as shown in the cause, being
omitted, and others not owned by him being included;
and reports no personal estate as owned by Evans, which
had not been disposed of, though he apparently did own
other personal estate. With reference to the subject
matter in controversy now before this Court, he reports
as follows:

### Evans & Conway Accounts.

" 5th. That the masters also settle the accounts of the
said George D. Evans and William Conway, and ascertain what sum, if any, is still due from the former to the
latter."

In response to the above clause of the order the commissioner reports, that while there is no adequate proof
of a *partnership*, or the exact terms upon which the said
Evans & Conway were doing business together from
the year 1854 to the fall of 1862, it is nevertheless well
established by the testimony, that during the period
aforesaid the said Evans & Conway were engaged
jointly in buying and selling stock, which stock was
kept and grazed to some extent on the several farms
mentioned in these proceedings, and the said parties
shared the profits according to some arrangements had
between themselves, the terms of which do not appear
by any written contract or the testimony in the case.

It is also adduced, that during a part of this time other
persons were associated with them, or with the said
Evans, and sharing the profits of the business. The
annual gross profits of the business as between the said
Evans & Conway for several years are given in the
testimony of defendant Conway, but subject to certain
losses and other contingencies, and so affected by other
testimony, as to preclude any intelligent settlement of
accounts between them. Under the circumstances the
commissioner can only say, that in consequence of the insufficient data furnished by the evidence, the absence of
of any contract of partnership, or other instrument,

or evidence showing the terms of the business, the inaccuracy of the evidence as to the amounts of the profits of said business already shared by each, and of the amount of capital furnished by each, and how the profits of the several farms, used by them in their business, were shared by each, it is entirely impracticable to attempt to settle the accounts of said Evans & Conway, considered as partners, during the period running from 1854 to 1862 inclusive.

The commissioner can only report, that during the period aforesaid the said Evans & Conway were buying and selling stock together under an arrangement, the terms of which are not ascertained; that the evidence seems to sustain the conclusion that the said Evans had furnished most, if not all, the capital for the business, and the said Conway performed most of the labor; that they were using the several farms held by them for their common business in grazing what stock they had on hand, and raising what grain they needed; that the two Furbee, and the Dawson farms were held by Evans exclusively, the Plum run farm by Evans & Conway equally, and the old Rawley Evans farm was held by Conway, with the exception of a share of one-ninth, which was held by Evans; that Conway principally superintended and farmed these several tracts, as far as there was any farming done, made repairs and permanent improvements on all of them, amounting in value to $2,000.00 or $3,000.00.

The above is as full a statement of the transactions between the said Evans & Conway during the period from 1854 to 1862, as the commissioner is able to make from the data furnished him. The partnership or business arrangement between the parties, under which they had been doing business from the year 1854, ceased about the time of the execution of the deeds of trust by the said Evans to Benj. M. and Warren C. Dorsey, in August 1862 and from that time only the commissioner reports the following accounts between the said parties." Then

follows the account in which he makes the charges of Evans against Conway, since August 1862, $3,278.87, a large portion of which is for rents of lands upon which no interest is allowed; the charges of Conway against Evans since August 1862, including charges for taxes paid, and improvements of land, amounted to $2,033.87, exclusive of interest, the difference in favor of Evans in the principal of these accounts since August 1862, being $1,245.00. And charging Evans with the $3,000.00 named in the deed of trust, and interest thereon to June 1, 1869, making $4,215.00, leaving a a balance in favor of Conway on June 1, 1869, of $2,970.00. This statement did not include payments made by Conway since August 1862 on the Plum run farm, owned by Conway & Evans, nor the taxes he had paid on said land, nor his improvements upon said land; nor does it include the rents of said land since August 1862, received by Conway. There follows however a statement of these matters, but it only shows the aggregate of the payments made by each party since 1854, not distinguishing clearly those made before and since August 1862. According to this statement, the aggregate amount of payments, made by Conway with interest to June 1, 1869, was $6,999.56, of which it appears that including interest $888.33 only had been paid prior to August 1862. The payments made by Evans all prior to that date with like interest, amounted to $4,277.33. This did not include $960.00 in cash, claimed to have been paid by him January 6, 1854. Including this payment, with interest thereon to June 1, 1869, his entire payments would have been $6,135.33. Taxes paid by Conway on this land since August 1862, amounted to $385.15; and his improvements on the same almost, if not quite all of them, since August 1862, amounted to $651.00. The rents of this land since August 1862, charged to Conway, are estimated at $350.00 a year; before that time, it is reported, they purchased this farm jointly. The total value of these rents with interest since August 1862 are estimated at $2,789.50.

Exceptions were filed to this report by all parties; and on November 12, 1869, the court set it aside, and re-committed the cause to a commissioner to ascertain and report on the various subjects named in the decree of May term, 1867, and in addition thereto to ascertain and report the amount and character of the original obligations executed by the defendants, George D. Evans and William L. Conway to William J. Willey, assigned by said Willey to John S. Chisler, deceased; what sums of money have been paid on same by said Evans & Conway, or either of them, either to said Willey before said assignment to said John S. Chisler, before his decease, or to John J. Chisler, as executor of said John S. Chisler, since the decease of said John S. Chisler; and also to ascertain what portion of the down payment of $2,000.00 on the five hundred acres of land, in the bill and proceedings mentioned, was paid by said Evans & Conway respectively, and when and to whom paid; and that said master ascertain what amount, if any, is due from said defendant George D. Evans, to said defendant William L. Conway on all accounts whatsoever; and that said master also ascertain and report what amount of funds, arising from the proceeds of the sale of the lands in said cause, has come into the hands of the receiver of this court; what amount of same has been disbursed by said receiver and in what account; and what funds still remain in the hands of said receiver, and what amount is still due on the judgment and claims against said defendant George D. Evans; together with anything else deemed pertinent by said master, or specially required by any of the parties thereto.

On January 27, 1870, commissioner Moreland made his report under this order. Such portions of this, as are necessary to understand the subjects of controversy in this cause now before this Court, are given below with the exceptions to such portions of the report:

"The commissioner reports that from the evidence in the cause, the provision in the said deed of trust to Ben-

jamin M. Dorsey, purporting to secure to William Con-
way 'the sum of about $3,000.00,' was only made and
intended to secure to said Conway so much of the un-
paid purchase money on the Plum run farm, as the said
Conway might have to pay for said Evans, and that in
fact the said Evans did not then owe the said Conway any
debt, and the commissioner therefore disallows said claim
under this head any further than to allow said Conway a
lien for $451.45, the amount the commissioner finds said
Conway has overpaid on said Plum run farm, as shown
under another head of this report."

Exceptions were endorsed on the foregoing report by
the defendant William Conway as follows:

### First Exception by Conway.

The defendant William Conway excepts to so much of
the foregoing report of commissioner Moreland as de-
cides or determines, that the said George D. Evans, at
the date of the deed of trust from said Evans to Benjamin
M. Dorsey, as trustee, was not indebted to the said Conway
in the sum of about $3,000.00, or any part thereof; and
that the said deed of trust to Benjamin M. Dorsey, as
trustee, in the bill, proceedings, and said report men-
tioned, purporting to secure said Conway " the sum of
about $3,000.00," was only made and intended to secure
to said Conway so much of the unpaid purchase money
on the Plum run farm, as said Conway might have to pay
for said Evans, &c. The said commissioner erred in his
decision in this respect, and in not reporting for said
Conway, and in his favor his said $3,000.00 debt, in said
deed of trust mentioned, with interest. (See said deed
of trust and evidence of said Conway, who was examined
as a witness.) The said $3,000.00 debt is not impeached
or in anywise impugned or drawn in question or put in
issue by the bill or pleadings in the cause, but on the
contrary thereof the bill admits said debt, and that it was
not necessary for said Evans to make said deed of trust to
secure said Conway in any of said purchase money for said

Plum run farm, which he might have had to pay after its date, because by the laws he would have had a lien upon Evans's moiety of the land for any amount of purchase money which he had paid or might pay over and above his proper share or proportion thereof, and a lien paramount and superior to any deed of trust lien Evans could have made. This is an afterthought of Evans and his confederates, Lazier & Co., to cheat and wrong said Conway.                     A. F. HAYMOND,

*Counsel for Wm. Conway.*"

The commissioner further reported that of the cash payment of $2,000.00 made on the purchase money of the Plum run farm of Willey in 1854, Evans paid $1,960.00 and Conway only $40.00; he also omits credits of moneys paid to Chisler's ex'r amounting to $700.00, the admission of them being made in the answer of Chisler's ex'r after the report was made. William Conway's counsel excepts to this omission; excepts to Conway's being credited with only $40.00 of this cash payment instead of $1,000.00, which he claims to have paid of this cash payment. The commissioner ascertains the state of all accounts between Evans & Conway as follows: He charges Evans with the balance due by Evans to Conway on payments made by them on the "Plum run farm," it being the amount over one-half of all paid up to that time which Conway had paid with interest to January 20, 1870, $451.45. He then charges him with certain items of account, amounting with interest to same date to $4,775.89; he makes no distinction in this statement between items before or since August 1862. If separated, it will be found that the items before 1862 with interest amounted to $815.50; the items since 1862 with like interest amount to $2,185.31; and the items charged in 1862 were Conway's interest in seventy or eighty head of cattle $1,200.00, interest on same to January 20, 1870, $504.00; and Conway's interest in four steers bought by Wilderman, $50.00, and interest on same

1877.
Special Term.

Vance
v.
Evans *et al.*

to January 20, 1870, $21.00 ; in all $1,775.00. The commissioner then charges George D. Evans with one-half of the taxes paid by Conway on the Plum run farm, all since 1862; this charge with like interest amounts to $197.00. The commissioners then charge Evans with one-half of the improvements made by Conway on this farm, no interest is allowed thereon, and the report does not show which of these charges for improvements were since, and which before 1862. This charge amounts to $325.00. The commissioner then charges Evans with Conway's share of profits of partnership and interest. The following is a copy of this portion of the commissioner's report, and also his recapitulation of the foregoing items:

"The commissioner also charges George D. Evans with Conway's share of profits of partnership according to the following estimate, most of which profits, according to the evidence, " Evans got up :"

| | |
|---|---:|
| Amount cleared on cattle in 1854............... ................ | $1,285 00 |
| Interest from January 20, 1855, to January 20, 1870...... | 1,966 50 |
| Amount cleared on cattle in 1855........... ...................... | 4,400 00 |
| Interest from ——, 1856, to January 20, 1870............. | 3,696 00 |
| Amount cleared on cattle and hogs. 1856..................... | 4,300 00 |
| Interest from January 20, 1857, to January 20, 1870....... | 3,354 00 |
| Amount cleared on cattle in 1857........ .................... | 1,450 00 |
| Interest from January 20, 1858, to January 20, 1870....... | 1,044 00 |
| Amount cleared on cattle in 1861...... ....................... | 400 00 |
| Interest from January 20, 1862, to January 20, 1870...... | 192 00 |
| Total ....... ........ ........ ...... ........ ......... ......... | $22,987 50 |

The evidence in the cause says that Evans got most of these sums, and the commissioner reports the amount that said Evans so got at 75 per centum, leaving 25 per centum still due Conway, $5,746.87.

### Recapitulation of Charges against Evans.

| | | |
|---|---|---:|
| 1. Amount overpaid by Conway on Plum run farm...... | $ | 451 45 |
| 2. Items of account against Evans ............................ | | 4,775 89 |
| 3. Half of taxes paid by Conway on Plum run farm...... | | 197 00 |
| 4. Half of improvements by Conway on Plum run farm.. | | 325 50 |
| 5. Conway's share of profits of partnership............... | | 5,746 87 |
| Whole amount charged against Evans...... ........ | $ | 11,496 71" |

1877.
Special Term.

Vauce
v.
Evans *et al.*

The commissioner then proceeds with Evans's account against Conway, and charges Conway with one-half of the rents of the upper Furbee farm at $150.00 per annum; the lower Furbee farm at $75.00 per annum; the Dawson farm at $175.00 per annum; and the Rawley Evans farm at $150.00 per annum; (all of them farms or Evans) from March 1, 1855, to September 1, 1862, with interest on same to January 20, 1870. This charge amounts to $3,900.95. He then charges Conway with one-half of the annual rents on the Plum run farm from September 1, 1862, to September 1, 1869, with interest on these items to January 20, 1870. This charge amounts to $1,784.20; he also charges Wm. Conway with the whole rent of the lower Furbee farm from September 1, 1862, to September 1, 1868, amounting to $739.80, and with one-ninth of the annual rents of the Rawley Evans farm, from September 1, 1862, to September 1, 1868, with like interest, Evans owning one-ninth of this farm. This charge amounts to $147.96. He charges Conway with the whole of the annual rents of the upper Furbee farm from September 1, 1862, to September 1, 1868, with like interest, amounting to $1,479.60; and with the whole of the rents of the Dawson farm from September 1, 1862, to January 1, 1866, with like interest amounting to $876.66; and also with one-half of certain items of partnership account, such items bearing date from 1855 to 1860; this charge amounts to $2,621.50. He also charges Conway with certain items of account in 1862. The following is a copy of these items, and also of the recapitulation of the accounts of Evans & Conway, made by the commissioner:

| | | |
|---|---:|---:|
| In 1862.- 38 head of cattle sent from New Creek.. ........$ | 760 | 00 |
| Int. from Jan. 20, 1863, to Jan. 20, 1870........ | 319 | 20 |
| In 1862.—230 head of sheep, at $2.20 per head.. .......... | 506 | 00 |
| Int. from Jan. 20, 1863, to Jan. 20, 1870 ......... | 212 | 52 |
| In 1862.—Balance on colt sold by Conway's son Henry... | 46 | 25 |
| Int. from Jan. 20, 1863, to Jan. 20, 1870......... | 19 | 40 |
| In 1862.—Balance on colt sold by Conway.................... | 25 | 00 |
| Int. from Jan. 20, 1863, to Jan. 20, 1870........ | 10 | 50 |
| Total........ ........  .........:....... ........ .............$1,898 | 87 | |

*Recapitulation of Charges Against Conway.*

1. Half rent of upper Furbee, lower Furbee, Dawson and Rawley Evans farms, from 1854 to 1862............$ 3,900 95
2. Half rent of Plum run farm since 1862.................... 1,784 20
3. Rent of lower Furbee farm since 1862...................... 739 80
4. One-ninth of rent of Rawley Evans farm since 1862.. 147 69
5. Rent of upper Furbee farm since 1862.... .... ........... 1,479 60
6. Rent of Dawson farm since 1862......... ... ..... ......... 876 66
7. Half of Jarrett judgment, and loss on cattle, &c...... 2,621 50
8. Amount of account since partnership..................... 1,898 87

Whole amt. of Evans's charges against Conway......$13,449 27

*Grand Recapitulation.*

Whole amount charged against Conway......................$13,449 27
Whole amount charged against Evans................ ... 11,496 71

Balance in favor of Evans as against Conway..... ...$ 1,952 56

To this report William Conway, by his counsel, filed these further exceptions:

"The said commissioner, under the fifth heading of his said report," says, he "charges George D. Evans with the balance due from Evans to Conway on the payments made by them on the Plum run farm, according to the following basis and calculation." This part of the said commissioner's report is excepted to, as being erroneous and unjust in the following particulars, which are hereinafter specified, to-wit:

1st. Under the head of "Paid by George D. Evans," said commissioner allows and credits said Evans with $1,960.00 of down payment of purchase money, which should only have been $1,000.00, as Conway paid Willey $960.00 and $40.00 of said down payment. (See evidence of said Conway.) This $1,960.00 credit is allowed Evans, as of February 24, 1854, as being paid to William J. Willey, and interest is also allowed said Evans on the whole $1,960.00, when it should only have been interest on $1,000.00.

2d. Under the head of "Paid by William Conway," the said commissioner fails to allow or credit said Conway with $1,000.00, the half of said down payment paid to said Willey. He only allows said Conway with

$40.00 thereof as being paid January 6, 1854, with interest from that date, when he should have also allowed and credited Conway with $960.00 more of said down payment, with interest from 24th of February 1854. Under the same head, said commissioner ascertains the amount paid by said Conway to be (of purchase money) $7,145.00. This amount is erroneous; it should have been more. The $960.00 aforesaid, with its interest from the time aforesaid, should have been allowed to said Conway in addition, and also $400.00, $100.00 and $200.00 credited on said purchase money obligation, and admitted by said Chisler, of which no account is taken by him in his said report. The commissioner also ascertains the balance due from Evans to Conway, under this head, to be $451.45. This is erroneous, for the reason that Conway is not allowed for the payments aforesaid, with interest.

3d. Under the head of " The commissioner charges Geo. D. Evans with the following items of account," the commissioner erroneously failed to charge Evans with the two Dawson purchase money notes, and failed to charge said Evans with the price and value of building by Conway of dwelling-house and other out-buildings, erected by Conway on the upper Furbee farm as it is called, being the Furbee tract that contains two hundred acres, or upwards. (See evidence of Conway and S. T. Gooch and others on this subject.) Yet the commissioner charges Conway under another head erroneously with the annual rent of said farm, or rather the one-half of annual rent of the same, up to September 1862, and for the whole of the rent of the same subsequently and up to September 1868. The commissioner under this head also erroneously charges said Evans with but one-half of receipt marked A. E. as of 1867. He should, instead of charging said Evans with one-half of said receipt (which is $1,750.00), have charged Evans with $3,500.00, the whole amount of said receipt. (See receipt and Conway's evidence on that subject.)

4th. Under the head of, " The commissioner also

charges Geo. D. Evans with Conway's share of profits of partnership, &c., which, according to the evidence, Evans got," commissioner ascertains the amount to be $22,987.50. The commissioner then, in contradiction of this, and erroneously, only charges said Evans with 25 per centum of this amount, or in other words one-fourth thereof, which is $5,746.87, when it should have been largely over that amount, according to the evidence of Conway and others on this subject; and the report fails to ascertain the profits further back than 1855. Evans, instead of being charged with the one-fourth of said $22,987.50 received by him, should have been charged with the one-half thereof, that is to say, $11,493.75.

5th. Under the head of "Recapitulation of charges against Evans," the commissioner makes the whole charges against Evans aggregate only $11,496,71. This is erroneous, and insufficient by several thousand dollars, because the 1st, 2d and 3d items thereof are insufficient, and less than they should be for the reasons above stated.

6th. Under the head of "The commissioner charges William Conway with one-half the rents of upper Furbee farm at $150.00 per annum, the lower Furbee farm at $75.00 per annum, the Dawson farm at $175.00 per annum, and the Rawley Evans farm at $150.00 per annum from March 1, 1855, to September 1, 1862," the commissioner erroneously charges said Conway with $550.00 per annum for rent of these farms from March 1, 1855 to September 1, 1862, and with interest on each year's rent from the end of the year up to said 1st of September 1870; or rather he charges Conway with one-half of said annual rents, with interest as aforesaid, from and to the date aforesaid, and erroneously charges Conway therefor with the sum of $3,900.95. This charge against Conway is erroneous, and not warranted by the evidence, or the laws, because it is prior altogether to the date of said deed of trust to said Benjamin M. Dorsey, in which Evans acknowledged his indebt-

edness to Conway of about $3,000.00; because also, by the arrangement and contract of partnership of said Evans & Conway, the use of these farms was to be furnished by Evans to the partnership, and Conway was to do the business of the partnership, such as buying the cattle, superintending, &c., and the profits, without reference to the use of the farms, were to be equally divided. If Conway is charged with one-half of the rents of these farms, he should be credited with the time and labor devoted to the partnership, which is nowhere done in said report. Conway seems to have devoted nearly his whole time to the business of the partnership, and Evans but little of his time; and this seemed to be on account of Evans furnishing these farms, &c., as an offset to Conway's time, labor, attention, &c. (See Conway's evidence on this subject, and other evidence filed with this report). This aggregate of $3,900.95 is also erroneous, because a large amount of it is made up of interest charged from the end of each year. If any part of these rent charges are correct in any view, no interest ought or could be charged until after 1st of September 1862, the date of deed of trust, and the time when Evans & Conway ceased to do business as partners. This account for rent, if it should be charged in any form against Conway, is only a running account of partnership, and should not draw interest as charged. The charge for the annual rent of each of these farms is exorbitant, and greatly more than authorized by the evidence on that subject. (See on this subject evidence of James Amos, Marcus Millan, Stephen S. Gooch, Charles Burgoyne, John Prichard, Thornton Billingsley, Andrew Ice, Thomas P. Boggess, Becket Wilson, Philip S. Basnett and others. Besides this, Conway, in right of his wife, during the greater part of said time was the owner of one-ninth of said Rawley Evans farm, and for this no allowance is made to Conway.

7th. Under the head of "The commissioner charges William Conway with one-half of the annual rents of"

the Plum run farm, from September 1, 1862 to September 1, 1869," the commissioner erroneously charges Conway with $1,784.20. The commissioner erroneously ascertains this sum by charging the annual rent of said farm at $400.00, and charging interest from the end of each year. This is wrong, because the annual rent of said farm was not worth $400.00 by a large amount. (See the evidence of the witnesses cited above on this subject); and it is wrong to charge interest from the end of each year, as charged by said commissioner. This rent and interest as aforesaid is charged up to January 20, 1870.

8th. Under the head of "The commissioner charges Wm. Conway with the whole of the rent of the lower Furbee farm from September 1, 1862 to September 1, 1868," the commissioner charges said Conway with $737.80. This charge is exorbitant and erroneous, because the rent charged is too much, as per the evidence of the witnesses above referred to on the subject of rents, and because the evidence of Conway &c., shows that during part of the time Evans used it, and because this farm was sold by commissioners Fleming and Sturgiss under decree in this cause in June, 1868 to James Evans, who then took possession and held it till it was sold again by said commissioners, when Craven Smith purchased it. Said commissioner also erroneously charges Conway with interest from the end of each year.

9th. Under the head of "The commissioner charges William Conway with one-ninth of the annual rents of the Rawley Evans farm from September 1, 1862 to 1868," the commissioner erroneously estimates the annual value of said last named farm at $180.00 (see evidence of witnesses before cited on rents), and charges Conway with one-ninth of the rent at the rate aforesaid, with interest from the end of each year. The annual value of said farm was not so much as $180.00 per year; and it is wrong to charge Conway with interest from the end of each year.

1877.
Special Term.

Vance
v.
Evans et al.

10th. Under the head of " The commissioner charges William Conway with the whole of the annual rent of the upper Furbee farm, from September 1, 1862 to September 1, 1868," the commissioner ascertains erroneously the annual rent of said last-named farm to be $200.00 per year. This is too much. (See evidence of witnesses above cited on rent). And the commissioner in this case also erroneously charges Conway with interest from the end of each year, and he charges rent to September 1868, when the farm was sold in June 1868 by said commissioners Fleming and Sturgiss in this cause.

11th. Under the head of " The commissioner charges Conway with the whole of the annual rents of the Dawson farm from September 1, 1862 to January 1, 1866," the commissioner erroneously fixes the annual value of said last-named farm at $200.00 : (See said witnesses' evidence as to rents). This also is exorbitant ; and he also erroneously charges Conway with interest on rent from the end of each year. Also the said George D. Evans used said farm in 1865 by pasturing it with some twenty-one head of cattle, till he sold it to Phillip S. Basnett, which was on the 23d day of October 1865 : (See answer of P. S. Basnett and the title bond of Evans filed therewith). The sale by Evans to Basnett was confirmed by the court in this cause.

12th. Under the head of " The commissioner charges William Conway with one-half of the following items," the commissioner erroneously charges Conway with $2,621.50 ; and in fixing and making up this charge, he erroneously charges Conway with amount of Jonathan Jarrett's judgment and interest thereon. This is wrong and unjust : (See evidence of Conway taken in the cause).

13th. Under the head of " The commissioner also charges William Conway with the following account," the commissioner charges Conway with the sum of $1,898.87 ; and to make up this charge the commissioner charges Conway with thirty-eight head of cattle, sent

from New Creek, at $700.00. This charge is erroneous, because the cattle only cost $18.00 per head, and there were only thirty-six of them, which amounts to $648.00, and they were brought from New Creek at Conway's costs by his son. (See evidence of Conway and his sons on this subject).

14th. Under the head of "Recapitulation of charges against Conway," the commissioner charges Conway erroneously with the aggregate sum of $13,449.27, which is made up of erroneous and improper sums, to which exceptions are above made and stated, and is unauthorized by the evidence in the cause.

15th. Under the head of "Grand recapitulation," the commissioner ascertains erroneously and unjustly, that the balance in favor of Evans as against Conway is $1,952.56. This is wrong, because the data, on which it is based, are false and incorrect, for reasons hereinbefore stated. Conway has no credit for the Dawson notes. From the evidence in the cause and a just and proper settlement of accounts of Conway & Evans, the said Evans is largely indebted to Conway. On the whole it is evident that Evans, at the date of said deed of trust, was largely indebted to Conway, and in a greater sum than $3,000.00; and this debt with its proper interest should be allowed to said Conway. The report of said commissioner is also excepted to, so far as it pretends to settle any accounts between Evans & Conway since the commencement of this suit; and the settlement of the partnership between Conway & Evans has not been justly done; and it was irrelevant and improper in this cause in this form; and Conway insists that on a fair and just determination of all the matters of account in proper form, and in the proper place, said Evans is largely indebted to him. But since the termination of said partnership much time has elapsed, and it is now difficult to adjust that matter with exact justice, even if an inquiry into the subject fully was relevant and proper.

All of which is respectfully submitted for the consideration of the Court.

A. F. HAYMOND,
*Counsel for Wm. Conway.*

A large number of depositions were taken to support the respective pretensions of Conway & Evans, of which even a summary cannot be given, without making the statement of this case entirely too voluminous. · In delivering the opinion I will state such portions of them, as are material to the full comprehension of the views of this Court.

On the 23d day of March 1870 the court overruled the exceptions to commissioner Moreland's said report, and confirmed the same; but it appearing from Chisler's answer, filed at that term of the court, that $700.00 of payments in addition to those allowed in said report had been made on the $5,000.00 bond, given by Evans & Conway for the residue of the purchase money of the Plum run farm, the cause was remanded to the commissioner to ascertain, when and by whom, and to whom the same was paid, and the true balance of the purchase money due on said bond, together with any matter deemed pertinent by him, or either party might require, touching the matter of said payments. On the 10th of August 1870 commissioner Moreland made his supplementary report under this order, in which he reports that this $700.00 was all paid by George D. Evans to John S. Chisler; $400.00 on July 21, 1860; $100.00 February 5, 1862; and the residue, $200.00 on May 12, 1862; and he reports that in his former report he improperly allowed a credit of $300.00 to William Conway, as paid to John S. Chisler in June 1856. He reports that the balance of the purchase money due to Chisler's executor on January 20, 1870 was $1,589.95. After allowing Evans credit for these several sums and correcting this alleged error, the commissioner, basing his statement in other respects on his former report, corrects the same and reports the balance due from William Conway to George

D. Evans, altogether, would be $2,757.46, instead of

$1,952.56, as formerly reported. Conway's counsel re-iterated his former exceptions; further excepted to the allowance to Evans. of the additional credits above named, and also to the disallowance to Conway of the credit of $300.00 above. On the 17th day of December 1870 the court overruled these exceptions, and confirmed this report. And on March 24, 1871 the cause was again referred to the commissioner to ascertain, what funds were under the control of the court, arising from the sales of Evans's property, real and personal, and how the same should be paid; as also what debts had been paid under orders of the court, or otherwise, and whether they were all liens on the property, out of the proceeds of which they were paid, or on what they were liens. On September 20, 1861 the commissioner made his report, showing what debts had been paid out of the sales of property of Evans, real and personal, and the surplus proceeds remaining under the control of the court. It is unnecessary to state in detail any portion of this report, except the following:

The commissioner reports, that all of the said debts and liens constituted judgment liens upon and against the property, conveyed by the said deed to Benjamin M. Dorsey, and that said judgment liens were respectively prior to any and all other liens upon said property, except that the lien of the said deed of trust to Benjamin M. Dorsey would constitute a lien on so much of the property, mentioned in said trust deed, as is situated in Marion county, of prior dignity to the liens of the judgments for said debts, inasmuch as said judgments were not docketed in said county of Marion, and all the property, mentioned in said trust deed to Benjamin M. Dorsey, is situated in the county of Marion, except the tract of land on Cheat river, since sold to C. S. Ley, and the bank stock of said Evans mentioned in said deed.

The commissioner further reports, that all the debts and liens so paid and discharged as aforesaid, constituted

liens upon and against the said surplus proceeds remaining as aforesaid of like priority and to the extent aforesaid, except that the amount of the debt found upon settlement to be due from William Conway, and which is included in said surplus proceeds, and which amounted on the 20th day of January 1870, inclusive of interest to that date, to the sum of $2,757.46, having accrued (for the most part, if not entirely, from the rents and profits of the lands of said Evans) since the rendition of the judgments aforesaid—most, if not all, of same having accrued since the execution of the trust deed aforesaid.   Consequently the judgments aforesaid would constitute liens only upon the amount of said indebtedness, that accrued prior to the 1st day of January 1864, the date of the expiration of the act of the General Assembly of the State of Virginia, passed January 30, 1863, staying the collection of certain debts, and making such debts to constitute liens upon the property, both real and personal, of such debtor."   Then follows a statement of accounts between George D. Evans and William Conway, which according to the commissioner left a balance of $1,938.09 due from Conway to Evans on January 1, 1864, including interest on such balance to January 20, 1870, leaving $819.37, as of that date, as the amount of Conway's indebtedness accrued since January 1, 1864.   The counsel of Conway excepted to this portion of the said report, which by the decree of September 21, 1871 was overruled ; and this report was confirmed, and the funds ordered to be paid over according to the rights of the various parties, as settled by previous orders of the court, or by said report, including the costs of the suit not already paid; "and excluding so much of said last mentioned costs, as have accrued from and by reason of the settlement of the accounts between said Evans & Conway, which said Conway is to pay as hereinafter provided."   And said decree further orders, that said Evans do recover of said Conway $2,757.46, with interest thereon from January 20, 1870, for the

benefit of his creditors; and that the said Conway do pay the same to the receiver of the court; and that unless he should so do in ninety days, execution might issue therefor in the manner named in said decree. And upon its receipt by the receiver, he is ordered to pay it out pursuant to said report of the commissioner. And the said decree then recites, that it appearing that said Conway and Evans are each liable to pay one-half of the balance of the purchase money yet remaining unpaid on the Plum run farm; and that said Conway's moiety thereof is amply sufficient to pay his said half of said residue of said purchase money; and that no one can be prejudiced thereby; it is further ordered, that unless Conway in a certain time named, pay his said half of said purchase money, his moiety of said tract of land shall be sold by commissioners, appointed by the court on terms therein named. From this decree, as also the several other decrees against him, Wm. Conway took an appeal.

*James A. Morrow,* for appellant :

All persons, materially interested in the subject, ought either as plaintiff or as defendants to be made parties to the suit. Under this rule the assignor of a chose in action is a necessary party, where, as an incident of the principal object of the suit, it becomes necessary to adjudicate upon the rights of the assignee: 1 Dan. Chy. Pr., 182, 184, and notes; Story's Eq. Pl. §572; *Clark* v. *Long,* 4 Rand. 451; *Corbin* v. *Emerson,* 10 Leigh 663.

The rule requiring the assignor to be made a party has been qualified; but the qualification does not relieve against the necessity of making George S. Bacon a party to this suit, and perhaps W. J. Willey ought to have been a party also : *Trecothick* v. *Austin,* 4 Mason 16; *James River and Kanawha Company* v. *Liltlejohn,* 18 Gratt. 81; Story's Eq., Pl. §153.

The objection for want of indispensable parties may be taken in the appellate court; and the court will itself

*(margin note:)* 1877. Special Term.

Vance v. Evans *et al.*

take the objection: *Jameson's adm'x* v. *Deshields*, 3 Gratt. 13 ; 18 Gratt. 83, 84 and cases cited.

No decree could properly be made between the defendants, Evans & Conway, in this cause ; because such decree had to be founded upon matters not stated in the bill, nor in litigation between the complainant and defendants or any of them: *Elliott* v. *Pell*, 1 Paige 263 ; *Jones* v. *Grant*, 10 id. 348 ; *Tipp* v. *Vincent*, 3 Barb. Chy. Rep. 613 ; *Buffalow* v. *Buffalow*, 2 Ired. Eq. R. 113 ; *Templeman* v. *Fauntleroy*, 3 Rand. 434.

In this case the defendant, Geo. D. Evans, alleging his own fraud ought not to be heard. He is estopped by his deed: *Duchess of Kingston's Case;* 2 *Smith's Leading Case*, 609, note (5 Am. ed.)

The deed is conclusive on the party executing it, not only as to the very point intended to be affected by the the instrument, but also as to the fact recited in it: *Id.*

It was error for the circuit court to decree a sale of the real estate, affected by the various judgments and trust liens, until the amount of those liens had been ascertained and their priorities adjusted: *Cole's adm'r* v. *McRae*, 6 Rand. 644 ; *Iaege* v. *Bossieux*, 15 Gratt. 83.

*P. H. Keck* argued the cause for appellee, and referred to :

*Balling* v. *Lersner*, 26 Gratt. 36 ; Code (1860) ch. 138, sec. 7.

GREEN, PRESIDENT, delivered the opinion of the Court:

This was a suit in chancery, brought in the circuit court of Monongalia county by Addison S. Vance against George D. Evans, William Conway and others. Its object was to obtain for the plaintiff, who, as surety, had satisfied a judgment against him and certain of the defendants, a subrogation to the equity of the judgment creditor, and to have the real estate sold, upon which the judgment was a lien, after adjusting the various liens

against it, and out of the proceeds to re-imburse the plaintiff for the moneys, so paid by him as surety. Among the liens to be so adjusted, was one, created by a deed of trust, dated August 28, 1862, executed by George D. Evans, which among other debts secured "a debt of about $3,000.00, which William Conway held against him," the grantor. The bill makes William Conway one of the defendants, but makes no allegations with reference to the *bona fide* character of the debt due him, nor any other allegation in reference to it, except simply in giving the contents of this deed of trust it is described among other debts, as securing "a debt of about $3,000.00 alleged to be due William Conway (his, the grantor's, brother-in-law)." To this bill but few of the numerous defendants, creditors of George D. Evans, filed answers. None of these answers, except those of George D. Evans and William Conway, allude to this debt to Conway. William Conway in his answer, filed promptly after the institution of the suit, claims that Evans was, when he executed this deed of trust, indebted to him "in the sum of $3,000.00, or even more, on account of money advanced, laid out and expended for his use and benefit," but gives no other account of the origin of this debt; he sets out at great length the transactions between him and George D. Evans with reference to the Plum run farm, which appear in the statement of the case which precedes this opinion, and claims to be the assignee of two bonds of Evans, executed to John Dawson, which were liens on a portion of Evans's lands. His answer concludes: "He therefore prays your honor to fully guard and protect him against further injury and loss, and to adjust and adjudicate the difficulties arising in this cause between himself, complainant, and other contestants, according to equity and good conscience; that if a cross bill be necessary, it be permitted to be filed."

George D. Evans's answer was not filed till some twenty-two months after the filing of the bill. In it he

says that he executed this deed of trust in which Conway's claim is, among others, secured; "that this was done with a view of enabling Conway to complete the payment of the joint obligations of himself and this respondent (George D. Evans), executed for the balance of the purchase money on the Willey farm, provided respondent should fail to meet his moiety of the Willey purchase money obligation." He then goes into a long statement of the transactions between him and Conway with reference to this farm, bought of Willey, and of the amount paid by each of them, in which his statements differ materially from those of Conway in his answer. The commissioner and court below adopted as correct most of the positions, taken by Evans in this answer in reference to this farm. He insists that Conway was not the assignee of the Dawson bonds, and that he held them only by having paid them off for Evans out of moneys furnished him by Evans. The answer also says, that "he (Evans) and the defendant (Conway) were engaged for a long time in the speculation of buying and selling cattle; and that the defendant (Conway) frequently sustained heavy losses in the purchase and sale of stock, amounting in all to large sums of money, which respondent (Evans) had to pay, he having furnished the capital to operate with; so that the defendant (Conway) who had been, and was then, in greatly embarrassed circumstances, during this operation, was enabled, through the aid of this respondent (Evans), to relieve himself ultimately of his insolvency, which was notorious among his acquaintances and neighbors; and your respondent (Evans) in his honest efforts to pay his debts, is reduced to extremely needy circumstances, while the defendant (Conway), representing himself as being rich, is seeking to swallow up what little property respondent (Evans), has left to secure his creditors in the payment of their just and proper claims, by claiming the benefit of the $3,000.00 secured in the trust deed, which is wholly improper and wrong;" and by other specified claims, also alleged to be wrong.

The only matters complained of in this Court, are the action and decisions of the court below upon the claim of Conway to the benefit of this lien in his favor, and the auditing of the amount due on this Willey farm, till other parties not made defendants are before the court. The court by several decrees directed, among other things, that its commissioner should ascertain the debts still due and owing from George D. Evans to the creditors severally named in this deed of trust, and that he should settle the accounts of George D. Evans and William Conway, and ascertain the amount due from one to the other. In settling these accounts the commissioner disregarded entirely the acknowledgment contained in the deed of trust, that Conway held a debt against Evans of about $3,000.00, and went back to the beginning of the transactions between these parties in 1854, and attempted to settle all matters between them, and reported Conway as indebted to Evans $2,757.46, with interest thereon from January 20, 1870; which action of the commissioner was approved by the court, and a decree rendered against Conway for that sum for the benefit of Evans's creditors, he having by a deed of trust conveyed all his personal estate for the benefit of certain creditors, and certain of his creditors having liens on such estate, as set forth in the statement of this case preceding this opinion. The commissioner does not ascertain either the amount due on the Plum run farm, purchased of Willey at the date of the deed of trust, nor the state of the accounts between Conway and Evans at that time. But an inspection of the items of his account would seem to indicate, that there was due then on said farm by Evans & Conway about $5,100,00; and that his indebtedness to Evans, at the time the deed of trust was given, differed probably but little from what it was on January 20, 1870, which was then, according to the commissioner's report approved by the court, $2,757.46.

The counsel for the appellant insists that the court below erred in adjudicating upon the matters in contro-

1877.
Special Term.

Vance
v.
Evans *et al.*

versy between the co-defendants, Evans & Conway, arising under the deed of trust of August 28, 1862, in which Evans secured a debt to Conway of about $3,000.00. He insists that the court below had no right to inquire into the question, as to whether this debt was *bona fide* and justly due from Evans to Conway, as its validity and *bona fide* character was not assailed in the bill. It is unquestionably true, that a decree between co-defendants can only be based upon the pleadings and proofs between the complainant and defendants, and that no such decree can be made between co-defendants founded upon matters not stated in the bill nor in litigation between the complainant and the defendants or some of them : See *Elliott* v. *Pell*, 1 Paige 263 ; *Jones* v. *Grant*, 10 Paige 348, also *Tripp* v. *Vincent*, 3 Barb. Ch. R. 613, and *Buffalow* v. *Buffalow*, 2 Ired. Eq. R. 113. On the other hand, where a case is made out between defendants by evidence arising by pleadings and proofs between the complainant and defendants, a court of equity may make a decree between defendants ; each of the defendants in such a case has a right to insist, that a decree shall be rendered between them, and that another suit should not be rendered necessary by the failure of the court to decide, what might then be properly decided. See *Templeman* v. *Fauntleroy*, 3 Rand. 434. If in the case before us Evans had in his deed of trust secured a bond for $3,000.00, which he owed Conway, and the bill had failed to charge, that the bond was executed in bad faith by collusion between the parties, though this had been stated in the answer of Evans, and fully established by proof, the court could not have declared by its decree, that this bond was fraudulent and ficticious, and set it aside, for in so doing it would have been rendering a decree between co-defendants, not based upon the pleadings and proofs between the plaintiffs and defendants ; but would have been rendering a decree in relation to matters not put in issue between the parties by the plead-

ings, and would have been making the declaration of a fact not in issue in the pleadings, and paying respect to evidence touching such fact, which can never be properly done by a court. See *Tripp* v. *Vincent*, 3 Barb. Ch. R. 613; *Buffalow* v. *Buffalow*, 2 Ired. Eq. R. 113.

But it seems to me, that the case, presented to the Court by the record in this case, is materially different from this supposed case. In the first place, the debt or alleged debt, due from Evans to Conway, was not a bond for any definite amount, as stated in the bill and deed of trust filed with the bill as an exhibit. The bill, on the contrary, states it to be " a debt of about $3,000.00, alleged to be due William Conway the brother-in-law of Evans." The bill prays, among other things, that Conway and Evans may be made defendants, and required to answer on oath this allegation, and particularly to say what amount had been paid on this debt; and the prayer for general relief, from the very nature and object of the suit, required the court to ascertain definitely the amount of this debt said in the bill to be alleged in the deed of trust to be about $3,000.00; and in order to do so the court could rightfully ascertain the condition of the accounts between the parties, when the deed of trust was executed, and also in what manner the balance was affected by their subsequent dealings. The court then did not err in its first decree, entered May 8, 1867, in directing the commissioner " to settle the accounts of the said George D. Evans and William Conway, and ascertain what sum, if any, was still due from the former to the latter." Though it ought to have gone further and ascertained what sum, if any, was due at the time the deed of trust was given. This decree was not founded on the answer of Evans, but on the allegations in the bill; the answer of Evans not having been filed till eighteen months afterwards. It is presumed, that the pendency of this inquiry before the commissioner suggested the answer of Evans. If in the prosecution of this inquiry it turned out, that at the time the deed of trust was given and

when the decree was to be entered, Conway was in-
debted to Evans and not Evans to Conway it might per-
haps be questionable, whether on the allegations in the
bill any decree could be rendered against Conway, there
being no allegation of his indebtedness in the bill; but
as by one of the deeds of trust, set forth in the bill,
Evans assigned for the benefit of creditors all the per-
sonal estate he had, which terms would have included
such debt due him, it might perhaps be proper for the
court, having legitimately made the inquiry into the
condition of the accounts between Evans & Conway, to
have followed it up by a decree against Conway, if he
was found in debt.    If Conway had filed no answer, it is
questionable whether the court upon the pleadings could
have rendered a decree against him; but this question, it
seems to me, was solved by Conway's answer, filed at
April rules 1867, in which he sets forth in detail the
transaction between him and Evans in connection with
the purchase by him and Evans jointly in 1854 of the
Plum run farm of Willey, setting forth the various pay-
ments, which he claimed to have made dating back as far
as the year 1854, and also the improvement he had made
on the farm, and also stating he held two bonds of Evans
executed to one Dawson, which had been transferred for
a valuable consideration to him, Conway, before the
execution of the deed of trust; and he prays the court
to "adjust and adjudicate the difficulties arising in this
cause between himself, complainant, and other contest-
ants according to equity and good conscience ; and that
if a cross-bill be deemed necessary, that it will be per-
mitted to be filed."    Conway having thus in his an-
swer invited the court to go back of the deed of trust,
and to adjudicate the difficulties arising in the cause
without change of the pleadings, cannot now be heard
to object to the court's so doing, even though, in thus ad-
judicating these difficulties according to equity and good
conscience, a decree is rendered against him.    The scope
of the inquiry directed to be made by the commissioner,

was evidently enlarged in accordance with the prayer of Conway's answer; the inquiry, with reference to what portion of the purchase money of the Plum run farm had been paid by Conway, and what by Evans, and with reference to improvements made on this farm, being evidently based on Conway's answer. Evans in his answer does not state, that the debt held by Conway for $3,000.00, as stated in the deed of trust, was so inserted with a fraudulent intent, and by collusion between him and Conway, but says it was so inserted "with a view of enabling the said Conway to complete the payment of the joint obligation of himself and respondent Evans, executed for the balance of the purchase money on the Willey farm, provided respondent Evans should fail to meet his moiety of the Willey purchase money obligation." The court having, as I conceive, upon the pleadings then a right to order a settlement of the accounts of Evans & Conway, both prior to and since the execution of the deed of trust on August 28, 1862, the next inquiry is: Was the settlement actually made by the commissioner, as finally approved by the court below, a just settlement or should it have been set aside on the exceptions of Conway's counsel. I have examined carefully all of the voluminous evidence in this cause, and have come to the conclusion, that the general views taken by the commissioner in his first report, and which have been quoted in the statement of the case, were not only correct at the time said report was made, October 1, 1869, but that none of the evidence taken since justified any change in these general views, though such subsequent evidence did show that certain items in this first report required correction, excepting only the treating of the debt due from Evans to Conway, as fixed by said deed of trust of August 28, 1862. The general conclusion then reached by the commissioner was, to use his own language, "that under the circumstances the commissioner can only say, that in consequence of the insufficient data furnished by the evidence, the absence of any contract of part-

nership, or other instrument, or evidence, showing the terms of the business, the inaccuracy of the evidence as to the amounts of the profits of their business already shared by each, and how the profits of the farms, used by them in their business, were shared by each, and of the amount of capital furnished by each, and how the profits of the farms, used by them in their business were shared by each, it is entirely impracticable to attempt to settle the accounts of Evans & Conway during the period from 1854 to August 28, 1862." It is true another commissioner, in a subsequent report, attempted to settle these accounts prior to August 1862 between Conway & Evans, and the court approved his report; but on an examination of these subsequent reports, and the evidence on which they are based, I think that this attempt at a settlement of their accounts ought to have been regarded by the court as a failure, the material, by which anything worthy of the name of a settlement could be made, not having been furnished the commissioner, and the evidence showing that it was impracticable to make such a settlement, the parties having really not preserved the means of reaching a just conclusion as to the state of these accounts between them prior to August 28, 1862. That such is the truth appears not only from a careful examination of the evidence, but is apparent on the face of these reports. It is unnecessary to go through these accounts and point out the uncertainty that surrounds many of the items, as it will suffice to point out a single item, which is entered in the accounts without anything, which can be called evidence, to support it, and which is nevertheless so large an item as to control, in a great degree, the results of the entire settlement. The commissioner reports, that the amount cleared on cattle and hogs by Conway & Evans, from 1854 to 1861, inclusive, with interest to January 20, 1870, amounted to $22,987.50; and then the commissioner says: "The evidence in the cause says that Evans received most of these profits; and the

commissioner reports the amount that said Evans received, as seventy-five per cent, leaving twenty-five per cent still due Conway, $5,746.87." There is, in my judgment, nothing in the evidence to justify the commissioner in this conclusion. On the same evidence, substantially, a former commissioner reported, "it was entirely impracticable to settle their accounts during this period." There was no data furnished, by which the profits of their business could be stated, which would approximate accuracy; and even if this could have been done, the evidence is utterly vague as to what portion of these profits were received by Evans, and what by Conway. The parties kept no accounts of the amounts received by either of them. Conway insists that Evans received most of these profits, while Evans testifies that, in his opinion, he never drew out of the business more than his share of the profits; while neither party furnishes any data to make any sort of estimate of how much was received by either. The commissioner accordingly makes no statements of moneys received by either from these profits; he simply reports, "that the evidence in the cause says that Evans received most of the profits, and the commissioner thereupon reports, that Evans received seventy-five per cent and Conway twenty-five per cent of these profits." Upon this evidence, he charges Evans with the receipt of $17,240.61, and Conway with the receipt of $5,746.61. He could, with equal propriety, have charged Evans with the receipt of $13,000.00, and Conway with $10,000.00; or Evans with $20,000.00, and Conway with $3,000.00. The court ought not to have approved such a report, but should have regarded the estimates made by the parties, when the deed of trust was given, as showing the true condition of their accounts at that time. It is true, no settlement was then made between them, and no accurate estimate made of the condition of their accounts; and they apparently differ greatly as to the estimate they then made; still, I think we may arrive at what their estimates then were with tolerable certainty, and cer-

1877.
Special Term.

Vance
v.
Evans et al.

tainly with far more accuracy than the mere guess which the commissioner has made.

To appreciate properly the statements and conduct of the parties, when this deed of trust was given, it is necessary to understand the situation of affairs so far as it can now be ascertained. The evidence shows, that prior to 1854 for many years Conway had been notoriously insolvent. At that time his brother-in-law, who possessed capital, partly with a view of aiding him entered into business with him in the purchase and sale of cattle; Evans furnishing all the capital and credit, and Conway doing the principal part of the labor. The parties kept no accounts of their receipts or disbursements. They did a large business, and Evans probably received the larger part of the profits, though there is no means of ascertaining what portion of the profits either received. Conway had a large family whom he supported, and his pecuniary condition during the continuance of their joint business greatly improved. This business continued till the deed of trust was executed by Evans, August 28, 1862, and for a short time afterwards. About the time this business commenced, on February 24, 1854, Conway & Evans jointly purchased of William J. Willey his Plum run farm for $7,000.00, of which $2,000.00 was paid in cash, and the joint bond of the parties was executed for the balance, $5,000.00. Of this $2,000.00, Evans actually paid over to Willey, $1,960.00 and Conway $40.00 only; though he now insists that one-half of the entire cash payment was made with his funds. Upon the bond, given for the deferred payment including interest to the time the deed of trust was given, Evans paid about $2,550.00, and Conway had paid nothing except $150.00, in April 1855, if we include a payment of $150.00 interest to April 1, 1855, which though stated by the commissioner to have been paid by Evans & Conway, ought to be further inquired into, for reasons hereinafter stated. The entire amount then due, of this purchase money was probably about $5,500.00.

Evans by his deed of trust, dated August 28, 1862, secured a debt to Conway of "about $3,000.00." Evans in his deposition says that this provision was inserted, "for the express purpose of indemnifying said Conway for the amount, he might have to pay on the balance back on said Willey farms, in the event that he, Evans, should be so unfortunate as not to be able to pay his portion of said balance, said sum so secured was in his opinion ample to secure his portion of said balance, and perhaps more, hence he used the language in the trust of "about $3,000.00." Conway, on the other hand, in his deposition states, that a few days before this deed of trust was executed, Evans told him of his pecuniary condition, and said he must then do something for Conway, and asked him if he would take it in land or in money, and Evans tried to sell some land to pay him, but failed to make the sale. He states that "Evans did not say at that time anything about what he owed him (Conway), but said his wind was gone, and he (Conway) would have to take the Willey farm and pay for it." He further states that a few days after the deed of trust was executed, Evans read it to him; he said that $3,000.00 would not cover what he (Evans) owed him. Evans replied, he made it about $3,000.00; but when we settle, if he (Evans) owed him more, it could be added to it, and if it was less, taken from it; as he (Conway) understood it $3,000.00 was what Evans owed him on account of their cattle dealing." It is obvious from the entire testimony, that there was no collusion between Evans and his brother-in-law, Conway, when this provision was inserted in the deed of trust, and there was no purpose on the part of Evans to defraud his creditors. And if their understanding at that time of the condition of their accounts can be ascertained, it ought to be adopted as the nearest approach to the truth that can now be reached, for it is obviously impossible to approximate justice by attempting a settlement *de novo*. The difficulty is to ascertain what the parties then thought was the

true condition of their account. There was an apparent misunderstanding then between them; but I think this was more apparent than. real, and that, in fact, they then agreed very nearly as to the true condition of their accounts. Conway says, "he understood that Evans owed him about $3,000.00 on account of their cattle dealings." But Evans had paid on their joint purchase of the Willey, farm $1,960.00 of the cash payment, which, with interest to the date of the deed of trust, amounted to about $2,850.00; and on their joint bond for the deferred payment he had paid $2,100.00, which, with interest to the date of the deed of trust, amounted to about $2,550.00; so that Evans's entire payments on that land amounted then to about $5,400.00. On the other hand, Conway had paid of this cash payment, only $40.00, which, with interest to the date of the deed of trust, amounted to only about $64.00; and on the credit payment $150.00, which, with interest to same date, only amounted to about $216.00; so that his entire payments on this land amounted then to only $280.00. If they had paid equally what had then been paid, they should each have paid somewhat over $2,800.00; so that Conway, on this purchase of the Willey land, then owed Evans more than $2,500.00; so that if, as Conway understood then, Evans owed him on their other dealings, about $3,000.00, their accounts then, taken altogether, were nearly square. According to Conway's understanding at the time, he did not regard the purchase of the Willey farm as constituting any part of the partnership transactions of Evans & Conway; and hence he considered that on these partnership transactions Evans owed him about $3,000.00; while, on this purchase of the Willey land, he owed Evans nearly as much. Evans, on the other hand, while he very nearly agreed with Conway as to the true state of their accounts, speaks of them from a different view, and hence the apparent conflict in their statements. He regarded the purchase of the Willey farm as a part of the

partnership transactions of Evans & Conway, and that all the payments made on this farm, whether by himself or Conway, were made out of the funds of the partnership, and equally for the benefit of each of them. When about to execute the deed of trust, knowing that he could in the future make no other payments on the Willey farm, and, as he told Conway, that he (Conway) would have to pay for it, he undertook, by the provision in his deed of trust, to indemnify Conway therefor. He says he inserted this provision in the deed of trust: "For the express purpose of indemnifying the said Conway for any amount, he might have to pay on the balance back on the Willey farm, in the event he (Evans) should be unable to pay his portion of said balance himself; said sum so secured, in his opinion, was amply sufficient to secure his portion of said balance, and perhaps more; and hence he used the language in the trust, about $3,000.00." It is obvious from this statement, that he regarded the purchase of the Willey farm as a part of the partnership business of Evans & Conway, and all the payments made by either of the partners as made out of the partnership funds; for the amount then remaining due on the Willey farm was a little less than $5,100.00. And if he had regarded this purchase as no part of the partnership business, and these payments as made out of his individual funds, and not out of the partnership funds, it would have been Conway's duty to have paid out of his own funds all the residue of this purchase money, Evans having paid more than half of the entire purchase money, and Evans would have owed Conway nothing after he, Conway, had paid all the residue of the purchase money, and the provision in the deed of trust to indemnify Conway would have been absolutely absurd. Evans however regarding all the payments that had been made on the Willey farm, as made out of partnership funds, properly considered, that when Conway paid the balance of the purchase money then due on the Willey farm, he would be in his debt to the extent of

one-half of this balance of the purchase money. He estimated roughly that the one-half of this balance of the purchase money was "about $3,000.00." It turns out it was only about $2,550.00. Evans states that at the time he deemed the amount named in the deed of trust as ample, and perhaps more than sufficient. As the security thus given for Conway was confined to what he might have in the future to pay for Evans, it is obvious that Evans regarded their past accounts, including the Willey purchase and all other transactions as about square. And in this opinion he differed but little, as we have seen from Conway. And this is the view which, I think, the circuit court ought to have taken, that it was wrong to attempt a settlement of the accounts of these parties de novo, and that, in the actual settlement as made, injustice was done Conway.

The court below should have adjudged, that all the accounts between Evans & Conway of every sort, including the purchase of the Willey farm, were on the 28th day of August 1862 square, and should then have ordered a settlement of the accounts between them subsequent to that day. In making this settlement the commissioner should have been, and should now be, instructed to regard Conway & Evans, as each entitled to one-half of the profits on all stock or cattle held by Conway & Evans on August 28, 1862. But should regard Conway as having no interest in the cattle and stock themselves, but only in the profits arising from their subsequent sale, the stock and cattle having been purchased out of funds advanced by Evans. All debts of Evans & Conway, paid since August 28, 1862, should be regarded as their joint debts, and one-half of such of them as were paid by Conway, should be charged against Evans as money paid for him; and in like manner Evans is to be charged with one-half of all sums of money, paid by Conway since August 28, 1862 on the purchase of the Willey farm, as so much money paid for Evans. Conway is not to be regarded as entitled to

either of the two Dawson purchase money notes advanced by him, the evidence showing that his claim of them is not well founded; he is to be credited by one-half to the taxes, paid since August 28, 1862 on the Willey or Plum run land, so long as a moiety of it was owned by Evans, and to the value of one-half of the improvements, put by him on said farm since that time, so long as a moiety of it was owned by Evans; and he is to be charged with one-half of the rents since that time, so long as the other moiety of it was owned by Evans. He is also to be charged with all the rents, received since that time of Evans's other real estate or of Evans's interest in other real estate, and to be credited by his improvements of such real estate and taxes paid thereon since that date. These rents should be charged at the amount per annum, heretofore fixed by the commissioner, as approved by the court, and the improvements since August 28, 1862 should also be credited to Conway, at the amounts heretofore fixed by the commissioner, and approved by the court; these estimates both of the annual value of the lands and of the improvements being sustained by the evidence. In charging these rents the commissioner should charge interest from the end of each year, in which the rents are charged. It is true, that at common law in actions for the recovery of rent in arrear, it was a general rule not to allow interest, because the landlord had a summary remedy by distress; but this rule was changed by the Virginia act of March 2, 1827. See Acts of 1826-7, chap. 27, §3; since then there seems to be no difference between debts due for rent and other debts. In the Code of Virginia of 1860, p. 618, chap. 138, §7, it is expressly provided, that " in actions for rent or for use and occupation, interest shall be allowed as on other contracts." And the same provision is in the Code of West Virginia, p. 527, chap. 93, §7. That the rent is what is called "estimated" can make no reasonable difference. See *Bolling* v. *Lersner*, 26 Gratt., 65. The commissioner in his report of August 10, 1870 in one place states, that

Evans paid to John S. Chisler on May 12, 1862 on the bond given for the purchase of the Willey farm $200.00; yet in calculating the balance due on this bond in the same report, he appears to have accidentally omitted this credit. Unless there is some good reason for this omission, in restating this account this credit should be allowed. The case however was not and is not now in a condition to justify an order to ascertain the balance due on this bond. This bond was, as the record shows by an indorsement on the back thereof, assigned absolutely to George S. Bacon by W. J. Willey ; and George S. Bacon, by an indorsement thereon, assigned it to John S. Chisler. This indorsement is in these words:

"For value received, I assign the within to John S. Chisler, reserving all interest that may have accrued prior to the 1st day of April 1853.

"GEORGE S. BACON."

With reference to this interest the commissioner reports thus : " Credit paid by Conway to Elizabeth Willey, $150.00. The balance of the interest to said date (April 1, 1855), in the absence of proof as to whom it was paid by, the commissioner presumes to have been paid by Conway & Evans, $150.00."

Neither W. J. Willey nor Geo. S. Bacon are parties to this suit. The general rule is, that where it is necessary to adjudicate the rights of an assignee, the assignor, or if he be dead, his personal representative must be made a party to the cause. See *Corbin* v. *Emmerson,* 10 Leigh 663. An exception has been made to this general rule, that where the assignment is absolute and unconditional, leaving no equitable interest whatever in the assignor, and the extent and validity of the assignment is neither doubted or denied, and there is no remaining liability in the assignor to be affected by the decree, it is not necessary to make the assignor a party : See *Trecothick* v. *Austin et al.,* 4 Mas. C. C. R. 44 ; *Ward* v. *VanBokelen,* 2 Paige 289 ; *James River and Kanawha Co.* v. *Littlejohn,* 18 Gratt. 83.

Wm. J. Willey comes within this exception, and it was therefore unnecessary to make him a party; but George S. Bacon does not; he has an interest expressly reserved to him in the assignment, and he or his personal representative, if he be dead, must be made a party, before the court could properly adjudicate, whether the interest in this note, which he expressly reserved to himself, had been extinguished. The court should therefore have required him or his personal representative to have been made a party defendant, and then should have made an order directing an inquiry to be made by the commissioner, as to whether the interest so reserved by him had been extinguished, and if so in what manner, and also what balance was due on said bond, and to whom. It is also urged as an error in this cause, that the court ought to have decreed no sale of the lands of Evans, till the amount and priority of all the liens had been ascertained. The decrees complained of in this respect are consent decrees, and the sales made under them have all been confirmed; and for each of these reasons this Court cannot now review them. See Code of West Virginia, chap. 132, §8.

So much therefore of the decree of March 23, 1870 must be set aside and annulled, as approves and confirms that portion of the report of commissioner Moreland, filed January 27, 1870, which was made in answer to the inquiry, "what sum, if any, is still due and owing from said Evans & Conway to John J. Chisler as executor of John S. Chisler, assignee of Wm. J. Willey;" and also that portion of said report, which was made in answer to the inquiry, " what amount, if any, is due from said Evans to Conway on all accounts whatsoever;" and also so much of said decree as directs the commissioner to ascertain the balance of the purchase money on the Plum run farm. And so much of the decree of December 17, 1870 must be set aside and annulled, as approves and confirms that portion of the report of commissioner Moreland, filed August 10, 1870, which was made in an-

swer to the inquiry, what was the balance of the purchase money due on said Plum run farm, together with anything else deemed pertinent touching the matter of the payments of same. And so much of the decree of the 21st day of September 1871 must be set aside and annulled, as approves and confirms that portion of the report of commissioner Moreland, filed September 20 1871 which reports the amount of the indebtedness of William Conway to George D. Evans, that accrued prior to January 1, 1864, as $1,938.09, with interest thereon from January 20, 1870, and states the whole amount of the indebtedness of William Conway to George D. Evans on the 20th day of January 1870 to be $2,757.46, and also so much of said decree as orders that said Evans do, for the benefit of his creditors, recover against said Conway $2,757.46, with interest thereon from January 20, 1870 till paid, and that said Conway do pay the same to the receiver of the court, and as authorizes execution to issue therefor, and directs the distribution thereof; and also so much of said decree as directs, that unless the said Conway, or some one for him, do pay within ninety days the one-half of the residue of the purchase money on the Plum run farm, as it appears to the court, L. S. Hough and A. Brooks Fleming, who were thereby appointed special commissioners for that purpose, should sell as prescribed Conway's undivided moiety of said land; and also so much of said decree, as reserves to George D. Evans for the benefit of his said creditors the right to come in under the footing of said decree, and ask for a sale of Conway's estate to pay said debt, found due to said Evans. And this cause should be remanded to the circuit court of Monongalia county with directions to cause George S. Bacon, or his personal representative, if he be dead, to be made a party defendant to this cause; and to proceed with this cause in the manner and according to the principles indicated in this opinion, and further according to the principles and rules governing courts of equity.

And the appellants must recover of the appellees, other than A. S. Vance, C. Nicholson, Brown & Wormley, William Lafferty, John Rogers, H. W. Gaddis, John H. Hoffman, P. H. Keck, The Frostburg Bank, William G. Brown, Philip S. Basnett, Rawley E. Dent and Nancy Dent, John J. Chisler ex'r of John S. Chisler, their costs expended in the prosecution of their appeal in this Court, which costs the circuit court aforesaid is directed to have paid out of the funds which are now, or may hereafter be, in its hand or under its control in this cause, other than the funds, which may arise from any sale of the one moiety of the Plum run farm owned by William Conway, should such sale hereafter be made in this cause.

CAUSE REMANDED.